**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

SYLVIA BARROIS                                         CIVIL ACTION

VERSUS                                                 NO. 14-2343

RELIANCE STANDARD LIFE INSURANCE COMPANY               SECTION "L" (3)

<u>ORDER & REASONS</u>

Before the Court are Defendant Reliance Standard Insurance Company's ("Reliance")

Motion for Summary Judgment (Rec. Doc. 15) and Plaintiff Sylvia Barrois' Motion for

Summary Judgment (Rec. Doc. 17).  Having reviewed the parties' briefs and the applicable law,

the Court now issues this Order & Reasons.

I.      **BACKGROUND**

        This case is before the Court as an appeal of Reliance's denial of Ms. Barrois' Long

Term Disability ("LTD") benefits.  Ms. Barrois was a participant in Superior Energy Services,

Inc. long term disability plan ("the Plan"), which is insured by Reliance group long term

disability policy number LTD 118464.  (AR 1-33)[1].  The Plan is governed by the Employee

Retirement Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Ms. Barrois claims she became

Totally Disabled under the terms of the Plan as a result of two strokes she suffered in 2011 and is

entitled to LTD benefits.

II.     **UNDISPUTED FACTS**

        Superior Energy Services, Inc. hired Ms. Barrois on April 7, 2007 as a Purchasing

Representative, which required Ms. Barrois to work Monday through Friday for forty (40) hours

a week.  (AR 596).  Ms. Barrois described her employment duties as making purchasing orders,

---

[1] AR refers to the Administrative Record, which can be found in the Court's Record Document No. 12.

tracking vendors, and assisting the billing department with file back-up.  (AR 610).  When asked to describe the physical/mental requirements of her job, Ms. Barrois answered, "filing, answer[ing] phone[s], meetings [,] memory of all information in order to do P.O.'s [and] tracking of vendor[s] on day to day bases, remember[ing] codes [and] jobs information."  (AR 610).  She described her physical activity level at work as "light." (AR 596).

On May 5, 2011, Ms. Barrois saw Dr. John Balart for neck pain.  (AR 913).  Dr. Balart took X-rays Ms. Barrois' spine, but the results appeared normal.  (AR 913).  On May 17, 2011, Ms. Barrois sought treatment from her general physician Dr. William Newman.  (AR 915).  She complained of headaches, and Dr. Newman ordered an MRI of her brain without contrast.  (AR 915).  The MRI presented signs of anemia, chronic sinus inflammatory changes, and "small chronic infarcts," which indicate a history of a stroke.  (AR 911).  The MRI otherwise appeared normal, specifically showing no acute infarcts, intracranial masses, hemorrhages, or "worrisome white matter."  (AR 911, AR 915-16).

On June 14, 2011, Ms. Barrois left work complaining of a headache, dizziness, blurred vision, confusion, fatigue, muscle spasms, back/neck pain and nausea. (AR 596, 662-663).  She expressed that she was "stressed and frustrated because she could not function effectively at work" due to these ailments.  (AR 847).  On June 15, 2011, the following day, she filed a claim for Short Term Disability ("STD") benefits.  (AR 596-97).

Under the Plan, Matrix Absence Management ("Matrix") administers both STD and LTD benefit claims on behalf of its sister company Reliance.  (AR 566).  Pursuant to the plan, STD benefits are paid on a monthly basis, and the claimant bears the burden of proving entitlement to benefits for each additional period of disability.  In order to prove entitlement, Matrix requires that claimants provide written certification of their continued disability from a treating physician.

(AR 14, AR 566).  STD benefits are payable for a maximum of 180 days, after which the claimant becomes eligible for LTD.  (AR 566).

On May 19, 2011, Ms. Barrois had an initial appointment with neurologist Dr. Dhanpat Mohnot.  (AR 568).  In the consultation report, Dr. Mohnot noted that Ms. Barrois was complaining of headaches that had begun in 2008, slowly gotten worse, and now occurred on a daily basis, causing "stabbing pain" and "ringing in her head."  (AR 474).  Ms. Barrois also reported nausea, motion sickness, photophobia, fatigue, stress, confusion ("disoriented feeling"), blurred vision, and difficulty finding words.  (AR 574).  Dr. Mohnot diagnosed her as suffering from chronic migraines, tinnitus, and episodic confusional states.  (AR 576).  He also noted the comorbidity of the cerebellar infarct, and ordered a number of tests, including a MRA, MRV, an additional MRI of her brain, both with and without contrast, and an EEG.  (AR 574).  Ms. Barrois underwent this second MRI on May 23, 2011, and it showed "a chronic infarct in the left cerebellar hemisphere, similar to 5/17/2011," indicating that she suffered from sinus inflammatory disease.  (AR 590).  The MRV, MRA, and EEG results were all normal, signifying that her cerebral veins and arteries were healthy.  (AR 589, AR 591-92).

On June 16, 2011, Ms. Barrois saw Dr. Newman for a follow-up evaluation of her headaches, fatigue, and episodic hypertension.  (AR 793).  Dr. Newman had previously determined that the hypertension was stress induced (AR 786); however, he was unable to identify a cause for her other symptoms.  (AR 793-96).  Dr. Newman ordered a series of tests, including an EKG, blood tests, and a CA Holter Monitoring Recording test, which was administered by attaching a heart monitor for a nine-hour period.  (AR 792).  The results of the blood tests and EKG proved normal (AR 799-800).  The results of the Holter test were non-conclusory, showing only "mildly abnormal" results in respect to an "occasional premature

ventricle contractions." (AR 792). Dr. Newman noted that cause of her malaise and fatigue remained unclear. (AR 792, AR 789).

Dr. Newman and Dr. Mohnot referred Ms. Barrois to Dr. Robert Kessler, a hematologist, for the purpose of ruling out a hypercoaguable state as the cause of her headaches. (AR 755). Dr. Kessler evaluated Ms. Barrois on June 23, 2011 and noted that she had a medical history of a CVA (cerebrovascular accident), which he referred to as "mini strokes." (AR 753-54). His testing revealed she was not in a hypercoagulative state, and her homocysteine levels were normal, therefore negating any theory that she suffered from a clotting disorder that caused her headaches. (AR 753). For treatment, he simply recommended observation. (AR 753).

On July 5, 2011, Ms. Barrois had another appointment with Dr. Mohnot. Ms. Barrois reported the same symptoms, including episodic confusional states, stabbing pains, and fatigue. (AR 568). Dr. Mohnot rendered no new diagnoses; however, Dr. Mohnot recommended that Ms. Barrois consider a neuropsychiatric evaluation. (AR 571). Following this appointment, on July 7, 2011, Dr. Mohnot submitted his case notes to Matrix and expressed his opinion that Ms. Barrois was currently unable to work. (AR 569). He listed the symptoms preventing her return to work, including "episodic confusional state, stabbing pain, intractable [headache], fatigue, fluctuating [blood pressure] … [right] cerebellar infarct, MTHFR…old stroke." (AR 569). When asked his prognosis for expected recovery, he replied that it was unknown as tests were still underway, but he estimated a return to work by September 30, 2011. (AR 569).

On July 7, 2011, Ms. Barrois had a follow-up appointment with Dr. Newman. (AR 786). She reported the same symptoms of headaches and fatigue, and he ordered several more tests in search of an underlying cause (AR 786-90), including a Basic Metabolic Panel blood test (AR 791); a Renal Artery Doppler (AR 783); an echocardiogram (AR 784); and urine sample

4

analyses (AR 785), all of which came back normal.  Based on these test results, Dr. Newman was able to rule out the hypothesis that she suffered from renal artery stenosis (AR 783), but he remained unable to form a diagnosis or treatment plan.  (AR 562).  Dr. Newman reported to Matrix that he did not yet know her prognosis for recovery, but he predicted she would be able to return to work by August 15, 2011.  (AR 563).

On July 11, 2011, Matrix informed Ms. Barrois that her claim for STD had been reviewed and accepted upon the receipt Dr. Mohnot's medical records and his written opinion of her status as disabled.  (AR 566).  In this letter, Matrix informed Ms. Barrois that she would be entitled to benefits until her estimated date of return to work, August 15, 2011.  (AR 566).  Matrix noted that if she was unable to return to work by that date, medical extensions would be granted, until the 180 day maximum, provided Ms. Barrois submitted the proper paperwork.  This supporting documentation included a treating physician's certification to her continued disabled status and a revised prediction of when she could return to work.  (AR 566-67).

On July 20, 2011, Ms. Barrois had another appointment with Dr. Newman.  (AR 779).  She informed him that her neuro-psychiatrist believed she had suffered a stroke 3-6 months ago, but that he believed her current headaches were due to stress and unrelated to the stroke.  (AR 779).  He noted that she "looks well- but can tell speech is a little slower."  (AR 782).  Dr. Newman made no new diagnosis, but he noted that the case was very unusual and requested a follow up appointment in two (2) months after she had seen Dr. Kessler again.  (AR 782).

On August 5, 2011, Ms. Barrios saw Dr. Mohnot, and he submitted the necessary STD benefit extension form to Matrix after the visit, expressing his opinion that Ms. Barrois was still unable to return to work due to daily headaches, confusion, and decreased memory.  (AR 525).

In response, Matrix informed Ms. Barrois on August 11, 2011 that her STD benefits had been extended through September 29, 2011.  (AR 560).

Dr. Mohnot referred Ms. Barrois to Dr. Kevin Greve for a neuropsychological evaluation. (AR 846).  Dr. Greve saw Ms. Barrois for testing on three dates: July 20th, July 29th, and August 9th of 2011.  (AR 846).  On August, 26, 2011, after testing was complete, Dr. Greve prepared of a summary of his findings. (AR 846-48).  He concluded that her global cognitive function was overall intact, but her spatial function and her working memory were impaired.  (AR 846).  He reported:

> Very little pain behavior was observed…Ms. Barrois demonstrated average verbal ...and average nonverbal intelligence…She demonstrated intact simple attention and concentration but was mildly to moderately impaired on tests requiring more demanding working memory skills. Her weakness in working memory may be more related to psychological factors. Sustained attention is intact. Functional language was intact and there was no evidence of language system dysfunction…Ms. Barrois' performance on all measures of executive functioning was intact.

(AR 848).

Regarding her psychological function, Dr. Greve reported that Ms. Barrois had "poor coping; develops physical symptoms secondary to stress."  (AR 846).  In his diagnosis, he wrote, "history of cerebellar stroke with resulting mild visual processing deficits; nonspecific deficits in working memory; adjustment disorder with stress-related medical and cognitive symptoms." (AR 846).  He diagnosed her with an "adjustment disorder with stress related medical and cognitive symptoms."  (AR 846-48).  For treatment, he recommended antidepressants, adjustment and stress counseling, and encouragement of increased activity and return to work. (AR 846).  Following this diagnosis, on September 6, 2011, Ms. Barrois began making weekly

visits to Dr. Laurie Darling, a clinical psychologist, "to address adjustment issues related to her physical functioning as well as unassociated stressors." (Rec. Doc. 870).

On September 8, 2011, Ms. Barrois saw Dr. Mohnot.  Ms. Barrois reported the same symptoms, and Dr. Mohnot submitted another form to Matrix attesting that Ms. Barrois was unable to return to work.  (AR 554).  Dr. Mohnot stated he would reevaluate her capabilities on November 8, 2011.  (AR 554, AR 524, AR 542).  On September 14, 2011, Ms. Barrois had a follow-up appointment with Dr. Newman. Dr. Newman indicated that Ms. Barrois still reported fatigue, "fluttering in [her] ear," and headaches, but her vital signs were all normal.  (AR 775-77).  Dr. Newman noted that she looked and seemed to be getting better.  (AR 775-77).  Dr. Newman also reported that Ms. Barrois had seen an eye doctor and Dr. Kessler, the hematologist, both of whom had found nothing of concern.  (AR 775).  Again, he recorded that this was a "very interesting case" and that he remained unable to diagnose her condition. (AR 775).  Under his notes for his plan of treatment, he wrote that Ms. Barrois should continue taking her aspirin along with "vitamins, [and] and counseling."  (AR776).  He ordered a follow-up in four months.  (AR 777).

On October 28, 2011, Matrix informed Ms. Barrois that her STD benefits had been extended, once again, through November 8, 2011, when she was scheduled for an appointment with Dr. Mohnot. (AR 531).  In reference to this extension, Matrix created an internal memorandum, making note of the fact that Ms. Barrois was currently taking antidepressants, under the treatment of a psychotherapist, and had been diagnosed with "stress related medical and cognitive symptoms."  (AR 530).  Matrix recorded they were currently unable to confirm whether Ms. Barrois' psychological or physical abilities were responsible for her disability status.  (AR 530).

Dr. Mohnot saw Ms. Barrois again on November 8, 2011.  Following this appointment, Dr. Mohnot sent another form certifying that he still believed Ms. Barrois was unable to return to work, and in response, Matrix extended her benefits through November 28, 2011. (AR 511-12, AR 623).

Pursuant to the Plan, Ms. Barrios' STD benefits could not exceed 180 days, so Ms. Barrois filed for LTD benefits.  Ms. Barrois' plan for LTD benefits states:

> We will pay a Monthly Benefit if an insured:
>
> > (1) Is Totally Disabled as the result of a Sickness or Injury covered by this policy;
> > (2) Is under regular care of a physician;
> > (3) Has completed the Elimination Period; and
> > (4) Submits satisfactory proof of Total Disability to us.

(AR18).

Thus, in order to qualify for LTD benefits, the claimant must meet the Plan's definition of "Totally Disabled."  The Plan includes two, distinct definitions of "Totally Disabled"/"Total Disability," the applicability of which depends upon the length of time the claimant has received benefits.  (AR 10).  First, the Plan states that a person is "Totally Disabled" or has a "Total Disability" if "during the Elimination Period[2] and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation." (AR10).  Here, "'Regular Occupation' means the occupation the Insured is routinely performing when Total Disability begins."  (AR 9). After twenty-four (24) months, for the claimant to remain entitled to benefits he or she must qualify under the second, altered definition of "Totally Disabled," which requires that as a "result of injury or sickness…. an insured cannot perform the material duties of *Any* Occupation which provides substantially the same income… or she is

---

[2] "Elimination Period" refers to an 180 day period of consecutive days of Total Disability, beginning on the first day of Total Disability, which must be completed before a claimant is eligible for LTD. (AR 7, AR 9).

capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis."  (AR 10) (emphasis added).  The Plan defines "Any Occupation" as an "occupation normally performed in the national economy for which an insured is reasonably suited based on his/her education, training or experience."  (AR 8).  Monthly benefits are terminated when the "insured ceased to be Totally Disabled" or "fails to furnish the required proof of Total Disability."  (AR 483).

The Plan includes the following limitation on the payment of LTD for Mental or Nervous Disorders: "Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period."  (AR22).  A Mental or Nervous disorder is defined by the policy as "disorders which are diagnosed to include a condition such as: (1) bipolar disorder (manic depressive syndrome); (2) schizophrenia; (3) delusional (paranoid) disorders; (4) psychotic disorders; (5) depressive disorders; (6) anxiety disorders; (7) somatoform disorders (psychosomatic); (8) eating disorders; or (9) mental illness."  (AR22).

On November 18, 2011, Matrix informed Ms. Barrois that her LTD claim had been received, and was under review pending the receipt of all pertinent medical records.  (AR 409). On December 2, 2011, Dr. Darling, Ms. Barrois' clinical psychologist, addressed a letter to Matrix in response to their requests for medical records.  (AR 870).  She wrote:

> …the condition for which I am treating [Plaintiff] is not inherently disabling from a psychological perspective. However, her overall reaction and response to her physical health and other psychosocial stressors is a complicating factor and presents an obstacle to her successful return to work. Therefore, goals of treatment have included improving her coping skills to reduce mood disturbance and enhance overall functioning, including a successful return to work. From a psychological perspective, I would recommend at

9

> this time an initial part-time return to work in approximately 3 months, with *light* duties, in an effort to accommodate cognitive and emotional difficulties (e.g. reduced attention and concentration, feeling overwhelmed easily, trouble following conversations or directions), with an intention to return to full-time work as she can manage additional duties.

(AR 870) (emphasis added). Here, "light" duties means "exerting up to 20 pounds of force occasionally, and/or 10 pounds of force frequently… Physical demand requirements are in excess of those for Sedentary Work." (AR 486, 1117).

On December 9, 2011, Ms. Barrois saw Dr. Lakisha Bastian, an internal medicine specialist.  Ms Barrois complained of chest pain and tightness in addition to her chronic headaches and nausea.  (AR 768-770).  Dr. Bastian ordered chest x-rays but found nothing abnormal. (AR 766).  Unable to find anything of concern, she referred Ms. Barrois to the ER for further evaluation. (AR 766).  Ms. Barrois had a follow-up with Dr. Bastian on December 20, 2011.  Ms. Barrois reported that her chest pain had resolved and that the Emergency Room doctors had determined she was anemic and noticed some abnormal thyroid levels. (AR 763-65).

On December 23, 2011 Dr. Newman responded to a form sent by Matrix which asked him to describe Ms. Barrois' limitations based on his diagnosis and to indicate her expected return to work date. (AR 750).  Dr. Newman reported that Ms. Barrois had a "neurological disorder with weakness that is undergoing evaluation and treatment. It is not clear when she can return to work." (AR 750).

On December 28, 2011, Matrix received a report from Amber Dannenmueller, a physical therapist who had been assisting Ms. Barrois since November 3, 2011 for her cervical and lumbar spine pain.  (AR 886).  Ms. Dannenmueller noted that Ms. Barrios still experienced pain, but the severity had decreased over the course of physical therapy.  (AR 886).  In this report, she wrote:

> I can only comment on physical limitations as indicated by her treating diagnosis as this time.  Due to her neck and low back pain it is recommended that Sylvia avoid heavy lifting (>20 lbs.), excess overhead activity, bending, and uninterrupted sitting and standing longer than 30 minutes as these activities continue to exacerbate her condition of spine pain.

(AR 891).

On January 13, 2011, Matrix sent Ms. Barrois a letter informing her that her claim for the initial, twenty-four month LTD had been approved.  (AR 420).  Based on the information submitted by Ms. Barrois and her physicians, Matrix determined that Ms. Barrois satisfied the Plan's definition of Total Disability applying to the initial 24 month period.  (AR 420).  According to this letter, Ms. Barrois' disability began June 15, 2011, and her Elimination Period was satisfied December 12, 2011, at which date her LTD benefit payment period began. (AR 420).  In this same letter, Ms. Barrois was informed:

> Benefits are payable for a maximum of 24 months if a disability occurs as a result of a mental or nervous disorder. At present, the medical information within your claim file suggests that your disability falls within this limitation. As your benefits started on December [1]2, 2011, the 24 month period will expire on December[1] 2, 2013 or the date you no longer meet the provisions of this policy, whichever comes first. [3]

(AR 421)

On February 27, 2012, the Social Security Administration (SSA) approved Ms. Barrois claim for disability benefits. (AR 961).  The SSA determined Ms. Barrois became disabled on June 15, 2011, and she was thus entitled to monthly benefits beginning in December 2011.  (AR 961).  The SSA indicated that it made this determination based on information provided by Ms.

---

[3] Reliance recorded the dates in this document as December 2, 2011 and December 2, 2013, but uses December 12th dates throughout the rest of its correspondence and documents. Therefore, these December 2nd dates are presumed to be typographical errors on the part of Reliance.

11

Barrois, and the SSA informed her that should immediately report if there was any change in this information she had provided. (AR 962).

On April 13, 2012, Ms. Barrois sought treatment for fatigue from Dr. Brian Corliss, M.D. (AR 1002-1004).  Ms. Barrois explained that the fatigue varied in intensity but was exacerbated by "emotional distress" and associated with symptoms including anxiety, hypertension, insomnia, and headaches.  (AR 1004).  She denied suffering from depression.  (AR 1002).  Dr. Corliss diagnosed her with anxiety, hypertension, fatigue, and "cerebrovascular accident, old", in reference to her old stroke.  (AR 1002).  He referred her to neurology.  (AR 1002).

On July 23, 2013, Matrix sent a letter to Ms. Barrois and informed her that they would discontinue her LTD benefits as of December 12, 2013—the end of her twenty-four month payment period—unless she was able to satisfy the stricter definition of Totally Disabled, which required Ms. Barrois to be disabled from Any Occupation.  (AR 443-44).  Under the Plan, "Any Occupation" is defined as "an occupation normally performed in the national economy for which an Insured is reasonably suited based up his/her education."  (AR 9).  Again, this differs from the Plan's definition of "Regular Occupation," which is applicable for the first twenty-four months of LTD and is defined as "the occupation the Insured is routinely performing when Total Disability Begins."  (AR 9).  In order to make the determination, Matrix informed Ms. Barrois that it would review her claim, along with all relevant medical records and information relating to her educational and vocational training. (AR 443-44).

On September 26, 2013, Matrix informed Ms. Barrois that it had concluded she no longer satisfied the definition of Totally Disabled, so Matrix would discontinue her LTD benefits on December 12, 2013.  (AR 464).  Matrix rendered this determination based on its conclusion that (1) Ms. Barrois disability fell within the Mental or Nervous Disorder exclusion, and (2) she

failed to satisfy the more stringent definition of Totally Disabled that requires the claimant to be

unable to perform the duties of Any Occupation.  (AR 464-66).  Matrix explained its decision,

writing:

> Based on the documentation provided, it appears that your Total
> Disability is caused by or contributed to by a mental or nervous
> disorder. The group policy limits payment of benefits for a
> disability due to such a condition to 24 months….Neurology notes
> reflected that you reported daily headaches, were overwhelmed,
> and confused, and it was recommended that you continue therapy.
> You were referred to a psychiatrist and you were to continue with
> your current medications… Your records document continued
> report of impaired memory and confusion; however, testing on file
> notes essentially intact cognition and memory with a diagnosis of
> adjustment disorder with emotional distress and focus on physical
> function. Based on the available medical information, in the
> absence of psychiatric impairment, there is nothing to preclude you
> from returning to work at a sedentary level of exertion. From a
> physical standpoint, sedentary work activity…is supported
> ongoing.

(AR 464-66).

Ms. Barrois appealed this determination.  Reliance Standard Life's Quality Review

Unit, and not Matrix, reviewed Ms. Barrois' appeal.  (AR 470).  On October 30, 2013, after an

initial review of her file, Reliance informed Ms. Barrois "that an Independent Medical

Examination (IME) would be required to further determine the extent of [her] disability."  (AR

472).  Ms. Barrois complied with this request, and she scheduled an IME appointment on

December 16, 2013 with neurology specialist Dr. Daniel Trahant. (AR 1150).  After this

appointment, in a report dated January 9, 2014, Dr. Trahant stated:

> The neurological examination itself was entirely normal…From a
> neurological standpoint with respect to her examination, she
> functions normal neurologically. I suspect a great deal of
> underlying psychogenic factors in her ongoing symptomology with
> regard to dizziness, nausea, and headaches, as well as memory
> difficulty. The neuropsychological testing by Dr. Kevin Greve is
> certainly of significance in this regard and supports this

13

conclusion. From a neurological standpoint, I would not place her
on any restrictions.

(AR 1157-58).

Dr. Trahant further concluded in a letter dated January 15, 2014 that Ms. Barrois no
longer needed treatment from a medical doctor, specifically a neurologist, nor any further neuro-
diagnostic studies.  (AR 1159).  In his opinion, her treatment plan would be complete with
"ongoing care by a clinical psychologist for the adjustment disorder with mixed
anxiety/depression."  (AR 1159).  He reported that Ms. Barrois' prognosis depended upon
continued psychological treatment and that she was capable of full recovery.  (AR 1159).
Finally, Dr. Trahant determined that all of Ms. Barrois' complaints were "on a psychological or
emotional basis" and that she had "no residual symptomology from a cerebellar infarction."  (AR
1160).  Thus, from a neurological standpoint, he concluded that Ms. Barrois was capable of full-
time, consistent employment from December 2013 onwards.  (AR 1159-60).

On May 30, 2014, Reliance denied Ms. Barrois' appeal.  (AR 482-89).  In Reliance's
denial letter, Reliance explained that an independent review, separate from those individuals who
made the original decision to terminate Ms. Barrios' benefits, had carried out a review of her
claim.  (AR 482).  This review concluded that her ongoing treatment notes showed improvement
in her headaches, fatigue, back pain, neck pain, and adjustment disorder to such an extent that
she was now capable of performing the material duties of a sedentary occupation.  (AR 486-87).
Specifically, Reliance noted that the diagnostic tests pertaining to her brain, back and head and
neck had all returned normal results.  (AR486).  Reliance also cited Dr. Darling's determination
that Ms. Barrois cognitive function was intact and her recommendation that Ms. Barrois return to
work with *light* duties (AR 486), which as defined under the Plan exceeds the demands of
sedentary jobs. (AR 116-17).  The Plan defines "sedentary" work to include

14

> exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(AR 482, 1116).   Furthermore, Reliance noted that the physical therapist's recommendation that Ms. Barrois "'avoid heavy lifting over 20 pounds, overhead activity, bending and uninterrupted sitting and standing longer than thirty (30) minutes' was also in excess of the physical demands of sedentary work."  (AR 487).  Lastly, they referenced Dr. Trahan, who wrote that he was of the opinion that Ms. Barrois was capable of full-time work from December 12, 2013, forward. (AR 487).

Reliance noted that in addition to Dr. Trahant's IME, a Vocational Specialist reviewed Ms. Barrois' claim file "to determine if the current restrictions and limitations defined as sedentary would prevent her from performing the material duties of Any Occupation." (AR 487). The Vocational Specialist conducted a Residual Employability Analysis and concluded, based on Ms. Barrois' skills and expertise, that she could perform the following sedentary positions: Purchasing Clerk (Clerical and Kindred Industry), Accounts Payable Clerk (Clerical and Kindred Industry), Customer Service Representative (Clerical and Kindred Industry), Order Clerk (Clerical and Kindred Industry), and Receptionist (Clerical and Kindred Industry).  (AR 487-88). The Vocational Specialist further concluded that Ms. Barrois could perform her Regular Occupation of Procurement Clerk.  Based on this information, Reliance concluded "Ms. Barrois no longer satisfied the definition of 'Totally Disabled' beyond December 12, 2013."  (AR 488).

Based on Ms. Barrois' medical records, Dr. Trahant's IME, and the Vocational Specialist Report, Reliance concluded:

> While we are not disputing she may have ongoing symptoms associated with the condition(s) of adjustment disorder, migraines, fatigue, neck and low back pain, our position is that the level of severity regarding her symptoms does not preclude her from *sedentary* work function…In summary, we have concluded…that Ms. Barrois is no longer considered '*Totally Disabled',* as defined in the group Policy. Thus she is not entitled to any further LTD benefits in connection with this claim."

(AR 488).

Reliance further explained that it had considered the SSA determination that Ms. Barrios was disabled but that Reliance was not bound by the SSA determination. (AR 488). Reliance noted that differences in the determination of her disabled status could be attributed to several factors, including different benefit entitlement guidelines and the consideration of different medical records. (AR 488). Reliance specified that the SSA did not review the results of Dr. Trahant's IME, which was not available at the time the of the SSA determination. (AR 488).

Since Ms. Barrois had exhausted her administrative remedies, Ms. Barrois appealed Reliance's denial of her benefits to this Court on October 13, 2014. (Rec. Doc. 1). Ms. Barrois seeks damages as provided by ERISA and Louisiana Contract Law.[4] (Rec. Doc. 1 at 4).

## III.   PRESENT MOTIONS

### A.   The Standard

The parties seek conflicting motions for summary judgment. Under ERISA, Federal courts have exclusive jurisdiction to review determinations made by employee benefit plan administrators, including disability benefit plans. 29 U.S.C. § 1132 (a)(1)(B). A district court must generally limit its review to an analysis of the administrative record. *Vega v. Nat. Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999). According to Rule 56(c) of the Federal Rules

---

[4] Although Ms. Barrois' Complaint seeks damages under a theory of breach of contract, Ms. Barrois does not reference these state law claims in her Motion for Summary Judgment. Further, ERISA would preempt such claims.

of Civil Procedure "the court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56 (c). The usual inferences in favor of a non-moving party do not apply

in ERISA cases. *Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 306 (5th Cir. 2015).

"[A] denial of benefits challenged under § 1132(a)(1)(B) is generally reviewed under a

*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*

*& Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). "[W]hen an administrator has discretionary

authority with respect to the decision at issue, the standard of review should be one of abuse of

discretion." *Vega*, 188 F.3d at 295. Thus, "An ERISA claimant bears the burden to show that the

administrator abused its discretion." *George v. Reliance Standard Life Ins. Co.*, 776 F.3d 349,

352 (5th Cir. 2015).

Under this abuse of discretion standard, a plan administrator's determination should be

upheld as long as the "decision is supported by substantial evidence and is not arbitrary and

capricious." *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d 389, 397-98 (5th Cir. 2004).

The Fifth Circuit has further clarified that "[s]ubstantial evidence is more than a scintilla, less

than a preponderance, and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 273

(5th Cir. 2004). Under this standard, a decision is arbitrary and capricious if it is "made without

a rational connection between the known facts and the decision or between the found facts and

the evidence." *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F. 3d 211, 215 (5th Cir.

1999). Review of the administrator's decision need not be particularly complex or technical; it

need only assure that the administrator's decision fall somewhere on the continuum of

17

reasonableness—even if on the low end." *Corry*, 499 F.3d at 398 (quoting *Vega*, 188 F .3d at

297). Therefore, where there are "conflicting medical opinions, with the plaintiffs' treating

physician generally supportive of a finding of disability and the defendants' internal reviews or

independent examining physicians determining otherwise…it is the role of the administrator, not

the reviewing court, to weigh valid medical opinions." *Killen,* 776 F.3d at 309. In sum, "a court

must give deference to the decision of the plan administrator and may not substitute its judgment

for the decision of the fiduciary.'" *Id.* at 307 (quoting 1A *Couch on Ins*. § 7:59 (3d ed.2014)).

The Plan vests discretionary authority in Reliance to interpret the terms of the Plan and

render benefit eligibility determinations. The Plan states:

> Reliance Standard life Insurance Company shall serve as the
> claims review fiduciary with respect to the insurance policy and
> the Plan. The claims review fiduciary has the discretionary
> authority to interpret the Plan and the insurance policy and to
> determine eligibility for benefits. Decisions by the claims review
> fiduciary shall be complete, final and binding on all parties.

(AR 14). Since Reliance exercises discretionary authority over the claims administration, the

Court must apply the abuse of discretion standard.

Ms. Barrois argues that the Court should apply a less deferential standard because

Reliance was biased in its denial of benefits, as Reliance served as the claim administrator and

payer and was thus economically incentivized to deny her benefits. Ms. Barrois argues that

"courts have continued to uphold that insurance companies that administer its own appeals are

suspect. If a claim or evidence is a tie, the plaintiff should be given the tie breaker." (Rec. Doc

17-2 at 14).

"[W]hen judges review the lawfulness of benefit denials, they will often take account of

several different considerations of which a conflict of interest is one." *Metropolitan Life Ins. Co.

v. Glenn,* 554 U.S. 105, 117 (2008). Weighing a conflict of interest does not "impl[y] a change

18

in standard of review, say, from deferential to *de novo*." *Id.* at 115. "Quite simply, 'conflicts are but one factor among many that a reviewing judge must take into account,'" and "the specific facts of the conflict will dictate its importance." *Holland v. Int'l Paper Co. Retirement Plan,* 576 F.3d 240, 247-48 (5th Cir. 2009) (quoting *Glenn* 554 U.S. at 117). "A conflict of interest should prove more important …where circumstances suggest a higher likelihood that it affected the benefits decision…It should prove less important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy." *Glenn* 554 U.S. at 117.

A court may afford more weight to a conflict of interest when the administrative process employed to render the denied claim indicated "procedural unreasonableness." *Glenn*, 554 U.S. at 118; *Schexnayder v. Hartford Life and Accident Ins. Co.*, 600 F.3d 465, 469 (5th Cir. 2010) Procedural unreasonableness refers to a situation where the "method employed by the plan administrator to make the benefit decision was unreasonable." *Truitt v. Unum Life Ins. Co. of America,* 729 F.3d 497, 510 (5th Cir. 2013) (quoting *Schexnayder*, 600 F.3d at 469-71)). The Fifth Circuit found a conflict of interest to be a minimal factor when a structural conflict of interest existed, but the conflict did not result in an economically-driven motivation to deny claims, and the administrator took steps to minimize conflict. *Holland,* 576 F.3d at 249. These steps included relying on the opinions of independent medical professionals when deciding claims. *Id.* Conversely, in *Schexnayder*, the Fifth Circuit weighed the conflict of interest factor more heavily when the "circumstances suggest[ed] procedural unreasonableness" because the administrator failed to address the SSA's award of disability benefits in its denial letters, and the administrator did not take steps to minimize the structural conflict of interest. 600 F.3d at 470-71.

Here, Reliance concedes that a structural conflict of interest exists because it operates as both insurer and decision maker.  Reliance nevertheless maintains that such a conflict only serves as a tie breaker when other factors are closely balanced, and that the conflict is insignificant in this case because there is "overwhelming evidence" to support the claim denial. (Rec. Doc. 13-2 at 7).  Ms. Barrois counters that Reliance's conflict is a significant factor, as evidenced by (1) its reliance on Dr. Trahant's IME, which concluded that Ms. Barrois did not qualify as Totally Disabled, over the opinions of Plaintiff's physicians Dr. Greve and Dr. Mohnot, and (2) the SSA's contradictory decision that Ms. Barrois is disabled "from any gainful employment."  (Rec. Doc. 17-2 at 14).  In response to these allegations, Reliance makes the point that "the SSA awarded benefits in 2011, but Reliance also deemed Plaintiff disabled then, and the SSA decision was not persuasive in 2013" in view of the Plain's definition of Total Disability.  (Rec. Doc. 21 at 28).  Furthermore, Reliance points out that Ms. Barrois relies on Dr. Greve's report, but his report actually supports Reliance's determination to deny Ms. Barrois benefits.  Reliance thus avers that Plaintiff relies solely on the judgment of Dr. Mohnot for her argument that she is Totally Disabled, and Dr. Mohnot's opinion is refuted by the medical records.  (Rec. Doc. 21 at 28).

Based on these facts, the Court is not persuaded by Ms. Barrois' argument that Reliance was biased in its claim determination and that the Court should apply a less deferential standard of review.  The Court is particularly struck by Ms. Barrois' failure to put forth any evidence to demonstrate *how* Reliance's conflict impacted its ultimate denial of the claim.  Ms. Barrois focuses on Reliance's deference to Dr. Trahant's allegedly erroneous decision that she was not Totally Disabled.  This argument is unconvincing, as Dr. Trahant performed an IME and was not employed by Reliance.  Reliance is also correct in that the medical records from Ms. Barrios'

own physicians support Reliance's determination, including the records of Dr. Darling and Dr. Greve.  Further, Reliance's emphasis on Dr. Trahant's opinion that Ms. Barrois was not Totally Disabled, without more, does not demonstrate that a conflict of interest affected this decision. To proclaim that the denial of benefits is evidence of bias constitutes a conclusory allegation, and such conclusory allegations will not compel this Court to afford more weight to a conflict of interest.

Ms. Barrois also argues that Reliance "completely ignore[d]" the SSA award, but the Administrative Record proves otherwise.  In Reliance's benefit denial letter, it explicitly recognizes Ms. Barrois' SSA award and offers several explanations for the difference between the two entities' determinations, including different institutional guidelines and the review of different medical reports.  (AR 488).  This case is thus distinguishable from *Shexnayder* because Reliance specifically addressed the SSA benefit determination and Reliance's reasoning for taking a different position, and Reliance took deliberate steps to minimize the conflict through the use of the IME.

In sum, because Ms. Barrois fails to cite any evidence that demonstrates how Reliance's conflict of interest affected its denial of Ms. Barrois' claim, the Court will consider the conflict of interest as a minimal factor.

### B.    Law and Analysis

Applying this deferential standard, the Court concludes that Reliance's denial of Ms. Barrois' LTD benefits was not arbitrary and capricious.  According to the terms of the Plan, in order to qualify for LTD after 24 months, Ms. Barrois must show that as of December 12, 2013, she suffered from a physical condition that rendered her unable to "perform the material duties of *Any Occupation* which provide[d] substantially the same earning capacity," (AR 10) and for

which Ms. Barrois would be "reasonably suited based on [her] education, training or

experience." (AR 9, AR 420-21). Reliance rejected Ms. Barrois' claim because it determined

that she could perform her prior occupation, as well as a number of other sedentary occupations,

such as receptionist or a customer service representative. (AR 1116). Reliance supports this

conclusion by citing to the results of a Residual Employability Analysis performed by their

Vocational Rehabilitation Specialist (AR1115-1129) and to medical records that indicate she was

physically capable of performing sedentary work. Specifically, Reliance cites Dr. Trahant, who

performed the IME and determined that "Ms. Barrois has a work capacity on a full-time

consistent basis as of December 12, 2013, and going forward. On her exam, she appears

neurologically intact and has no residual symptomology from a cerebellar infarction." (AR

1158-59). Reliance also refers to the report of Ms. Barrois' physical therapist, who

recommended that Ms. Barrois avoid heavy lifting of greater than 20 lbs., overhead activity,

bending, and uninterrupted sitting or standing in excess of thirty minutes." (AR 891). These

limitations were consistent with, and even in excess of, the physical demands of sedentary work.

Finally, despite her doctors' repeated efforts to diagnose her ailments through diagnostic tests,

including multiple MRIs, blood tests, heart monitors, and X-rays, not one test identified a

physical, medical abnormality. (AR 486). The Administrative Record thus provides no objective

evidence to support Ms. Barrois' claim of Total Disability and to refute Reliance's conclusion

that Ms. Barrois could perform "Any Occupation."

Ms. Barrois argues that Reliance decision is arbitrary and capricious because "Dr.

Trahant's opinion does not satisfy the substantial evidence standard." (Rec. Doc. 20 at 13). Ms.

Barrois argues that Dr. Trahant's opinion is insufficient to support the decision because he did

not actually state that Ms. Barrois was "not disabled as defined by the policy" and did not state

that a person suffering her numerous history of symptoms—including but not limited to nausea, dizziness, forgetfulness, and depression—would be approved for work. (Rec. Doc. 20 at 12-13). As previously explained, the Court's standard of review is extremely deferential to the administrator's decision. The substantial evidence requirement referenced by Ms. Barrois only requires that there be a rational connection between the known or found facts and the decision that she is not disabled, and that the decision fall "somewhere on the continuum of reasonableness, even if on the low end." *Corry*, 499 F.3d at 397-98. Furthermore, Reliance did not solely rely on Dr. Trahant's opinion when it denied Ms. Barrois' claim, but Reliance also cited the opinion and records of the Vocational Expert, Dr. Greve, Dr. Darling, and the physical therapist, all of whom concluded that Ms. Barrois was physically capable of returning to sedentary employment. The Administrative Record thus provides "more than a scintilla" of evidence to support Reliance's conclusion that Ms. Barrois could perform "Any Other Occupation" and was not Totally Disabled under the Plan. *Ellis*, 394 F.3d at 273.

Even if Ms. Barrois qualified as Totally Disabled, Ms. Barrois would not be entitled to LTD benefits because Reliance's determination that her claim fell within the Plan's Mental or Nervous Disorder exclusion was not arbitrary or capricious. The Administrative Record contains substantial evidence that Ms. Barrois' mental disorders, specifically her Adjustment Disorder, anxiety, and depression, contributed to and likely caused her impairment status. This bars her from receiving benefits under the Plan's Mental or Nervous Disorder Exclusion. (AR 22).

The Plan's Mental or Nervous Disorder exclusion states that "monthly benefits for Total Disability caused or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months." (AR 22). The Fifth Circuit has interpreted the meaning of the "caused or contributed by" language in similar exclusion

clauses to "exclude coverage only when the claimant's physical disability was insufficient to render him totally disabled." *George,* 776 F.3d at 355-56. In other words, the relevant question for courts to ask in determining whether a person's coverage should be excluded is "whether the mental disability is a but-for cause of the total disability." *Id.* at 356. Therefore, the question for this Court to consider is whether Ms. Barrois' physical condition was "independently sufficient to render [her] Totally Disabled." *Id.*

Here, there is no indication that Ms. Barrois suffered from any disabling physical medical condition independent of her mental disorders. On the contrary, the record indicates that Ms. Barrois' mental disorders played a significant role in preventing her return to work. In Dr. Greve's neuropsychological report, Dr. Greve reported that "Ms. Barrois is experiencing significant stress…Because of this stress she is experiencing a number of physical and cognitive symptoms that interfere with her ability to function at work. It is likely that her coping skills are not sufficient to manage this stress." (AR 551). Dr. Greve diagnosed Ms. Barrois with Adjustment Disorder, Mixed Anxiety, and Depressed Mood, and he specifically noted that Ms. Barrois "develops physical symptoms secondary to stress," thereby indicating that her mental condition was indeed a "but-for cause" of her disability. (AR 548-552). Dr. Greve's opinion is supported by Dr. Darling's notes, which state that Ms. Barrois' "adjustment issues related to her physical functioning as well as unassociated stressors… [are] a complicating factor and presents an obstacle to her successful return to work." (AR 870). Finally, Dr. Trahant found no evidence of any lasting neurological impairment from her stroke that would prevent her from working, but concluded that "[a]ll of her physical complaints are on a psychological and emotional basis." (AR 1160). The record thus indicates that her mental conditions were the source of any alleged disability.

24

Ms. Barrois argues that her stress and adjustment disorder were caused by her stoke, a physical injury, and therefore she should not be disqualified under the Mental or Nervous Disorder exclusion.  This argument, however, is unconvincing.  First, Ms. Barrois fails to indicate *any* evidence that her mental or nervous condition are the sole result of her stoke. Second, even if Ms. Barrois were to prove that her mental disorders were solely induced by her stroke, it would not negate the fact that depression, anxiety, and adjustment disorders are mental conditions and therefore subject to the exclusion clause.  In *Tolson v. Avondale Industries, Inc.,* the 5th Circuit ruled:

> Simply because a medical problem and an ensuing disability are produced by depression (a stereotypical mental condition or disorder) that is itself the product of a pathological disease (Hepatitis) or of the medication used to treat such a disease (Interferon), the fact is not altered that the depression is and remains a mental disorder or condition. It follows inescapably that (1) coverage of the costs of treating that depression, like treating of any depression, is subject to ….limitations of the [insurance policy], and (2) payment of benefits for disability produced by that depression, like disability produced by any nervous or mental disorder, is subject to …limitations of the [insurance policy.

141 F.3d 604, 610 (5th Cir. 1998).  Therefore, even if Ms. Barrois established that her mental condition stemmed entirely from her stoke, the Mental and Nervous Disorder exclusion would remain applicable.

In sum, the Administrative Record contains sufficient support for the Court to find that Reliance's denial of Ms. Barrois' LTD claim did not constitute an abuse of discretion because she is not "Totally Disabled," as defined by the Plan, and because she falls within the Mental and Nervous Disorder exclusion.

**IV.     CONCLUSION**

      For the aforementioned reasons, **IT IS ORDERED** that Reliance's Motion for Summary

Judgment (Rec. Doc. 15) is **GRANTED** and Plaintiff Sylvia Barrois' Motion for Summary

Judgment (Rec. Doc. 17) is **DENIED**.  Ms. Barrios' claims are hereby **DISMISSED WITH**

**PREJUDICE**.

      New Orleans, Louisiana this 17th day of August, 2015.

                                            _____

                                            UNITED STATES DISTRICT JUDGE